## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, ) | |
| ) | |
| Plaintiff ) | |
| ) Civil Action No. 07-712 (ESH) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| JUSTICE, ) | |
| ) | |
| Defendant ) | |

### PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the Rules of the United States District Court for the District of Columbia, plaintiff Democratic National Committee ("DNC") respectfully moves the Court for an order granting summary judgment to the DNC on its claims under the Freedom of Information Act. The grounds for this Motion, as set forth in detail in the accompanying Memorandum of Points and Authorities in Support of DNC's Cross-Motion for Summary Judgment and in Opposition to DOJ's Motion for Summary Judgment, are that, based on the undisputed material facts, the documents being withheld from disclosure under FOIA by defendant U.S. Department of Justice are not exempt from disclosure under Exemption 5 of FOIA; and accordingly, that the DNC is entitled to judgment as a matter of law. In accordance with Local Rules 7(h) and 56.1, also attached hereto are Plaintiff's Response to Defendant's Statement of Material Facts As To Which There Is No Genuine Issue and Plaintiff's Statement of Materials Facts As to Which There is No Genuine Issue, and a Proposed Order.

Dated: February 14, 2008

Respectfully submitted,


/s/  Joseph E. Sandler

———————————————————————

Joseph E. Sandler
D.C. Bar # 255919
Elizabeth F. Getman
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E. Suite 1102
Washington, D.C. 20003
Telephone: (202) 479-1111
Fax: (202) 479-1115
e-mail sandler@sandlerreiff.com

Attorneys for Plaintiff
Democratic National Committee

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, ) | |
| ) | |
| Plaintiff ) | |
| ) Civil Action No. 07-712 (ESH) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| JUSTICE, ) | |
| ) | |
| Defendant ) | |
| ) | |

**PLAINTIFF DNC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DNC'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

The remaining issues in this case are the decisions of the defendant Department of

Justice ("DOJ") to withhold 68 pages of e-mails, in whole or in part, under Exemption 5

to the Freedom of Information Act, 5 U.S.C. §552 ("FOIA), based on the presidential

communications and deliberative process privileges; and to withhold five pages based on

Exemption 6.

Each of the e-mails withheld based on Exemption 5 was addressed to or received

from one or more individual White House staff members using an e-mail account owned

and assigned by the Republican National Committee ("RNC"), so that these White House

staff members, when engaged in politically-oriented communications, would avoid

unlawful use of official resources for partisan political purposes. Moreover, e-mails sent

over these RNC e-mail accounts were not treated as being subject to the federal laws

governing official records. Thus, in sending or receiving these communications, the

White House staff members were not acting in their official capacities as presidential

advisers, nor were they engaged in official decision-making or deliberations on behalf of

any government agency. For those reasons, the presidential communications and

deliberative process privileges do not apply and Exemption 5 does not provide grounds

for DOJ's failure and refusal to disclose these e-mails. Summary judgment should

therefore be granted to the DNC.

With respect to the five pages withheld based on Exemption 6, based on review of

the DOJ's Motion, the DNC agrees that this exemption was properly invoked as to those

five pages and is not further contesting the withholding of those five pages.

## BACKGROUND

In March 2007, DNC Chair Governor Howard Dean submitted a request to the

DOJ under FOIA seeking the following records from the Offices of the Attorney General,

Deputy Attorney General and Associate Attorney General:

> (a) all documents in the possession, custody or control of the Office of the
> Attorney General, Office of the Deputy Attorney General and Office of the
> Associate Attorney General, prepared on or after November 1, 2004,
> constituting, reflecting or referring to communications to or from or to any
> officer or employee of the Republican National Committee or any state or
> local Republican Party committee referring, relating to or discussing (1) any
> prospective or ongoing investigation or prosecution; (2) initiating any
> investigation or prosecution; or (3) the appointment or termination of any
> United States Attorney; or the performance work or activity of any United
> States Attorney or Office of United States Attorney; and

> (b) all e-mail messages in the possession, custody or control of the Office of the
> Attorney General, Office of the Deputy Attorney General and Office of the
> Associate Attorney General, sent on or after November 1, 2004, to or from
> any e-mail address including the domain name "GWB43.com."

2

(Defendant's Statement of Material Fact As to Which There Is No Genuine Issue ("Def. Stmnt. Material Facts") ¶ 1). The DOJ and other agencies to which the request was referred produced a number of documents to the DNC pursuant to this request, and a number of documents were withheld in full or in part by the DOJ and other agencies, as described in the DOJ's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") at 2-4.

At this point, there are no documents in category (a) at issue. The only documents at issue fall into category (b): e-mails sent to or from "GWB43.com" e-mail addresses. These documents consist of 68 pages of e-mails being withheld in whole or in part under Exemption 5. (Def. Mem. at 4; *see* Joint Stipulation filed Jan. 24, 2008 (Dkt. No. 10)). These 68 pages of documents are described in the Declaration of Melanie Ann Pustay submitted with DOJ's Motion and in the *Vaughn* index attached as Exhibit K to the Pustay Declaration ("Pustay Decl").

The "GWB43.com" domain name was used for e-mail accounts belonging to and assigned by the Republican National Committee ("RNC"). *See* Senate Judiciary Committee, *Hearing on Preserving Prosecutorial Independence*, 110th Cong., 1st Sess., (Aug. 2, 2007) at 2-3 (relevant excerpts of hearing transcript attached hereto as Exhibit 1). According to an Interim Report prepared by the majority staff of the U.S. House Committee on Oversight and Government Reform, at least 88 White House officials had RNC e-mail accounts at some point. *See* U.S. House, Committee on Oversight and Government Reform, *Interim Report: Investigation of Possible Presidential Records Act Violations*, Exec. Summary (June 2007) (entire report attached hereto as Exhibit 2). The reason for use of these e-mail accounts by White House staff members was explained by

3

White House Deputy Spokesman Dana Perino at a White House regular press briefing on

April 13, 2007:

> [T]alking about—specifically about GWB/RNC-hosted accounts, out of an abundance of caution at the beginning of the administration there were two basic notices in terms of policy on this issue. One was official White House business should be done on official White House accounts. The second one was—and it was much more extensive—how an individual who has responsibilities in both the political and official worlds would avoid violating the Hatch Act. And that was very explicit, and the Hatch Act says you cannot use a government issued computer or any sort of government-issued equipment, which is paid for by taxpayer dollars, to do any sort of political business.

Federal News Service, White House Regular Briefing (April 13, 2007) at 3 (excerpts of

transcript of Briefing attached hereto as Exhibit 3). Ms. Perino went on to explain that the

policy had been clarified during the spring of 2007:

> White House business still needs to be done on White House official accounts. Political . . . political affairs business needs to be done on your RNC account. We want to make sure that people aren't using government sponsored—or government paid for equipment to do political business.

*Id.* at 5.

Under the Hatch Act, certain employees—including employees paid for by the

Executive Office of the President—may engage in political activity while the employee is

on duty and while in their government offices, but only "if the costs associated with that

political activity are not paid for by money derived from the Treasury of the United

States." 5 U.S.C. § 7324(b)(1). In other words, under the Hatch Act, most White House

staff members can lawfully engage in political activity during working hours, in their

government offices, but cannot use any government resources in doing so. Thus, RNC e-

mail accounts were assigned to certain White House staff members to enable those staff

members to engage in political communications, using e-mail, without using government

resources; instead, they would use an e-mail account (and thus an e-mail server, system, etc.) paid for by the RNC.

## ARGUMENT

### I.    STANDARD OF REVIEW

In reviewing motions for summary judgment under FOIA, the Court must conduct a *de novo* review. 5 U.S.C. § 552(a)(4)(B). "In the FOIA context, '*de novo* review requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not 'agency records' or are exempt from disclosure under the FOIA.'" *Hodes v. U.S. Dept. of Housing & Urban Devel.*, 2008 U.S. Dist. LEXIS 6609, *4 (D.D.C. 2008) (*quoting Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2002) (internal citation omitted)). "Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester. . . . " *Hodes*, 2008 U.S. Dist. LEXIS 6609 at *5. The Court may grant summary judgment for the FOIA requester if there is no genuine issue of material fact and the requester is entitled to judgment as a matter of law. *E.g., Aftergood v. Nat'l Reconnaissance Office*, 441 F. Supp. 2d 37, 41-42 (D.D.C. 2006).

### II.    EXEMPTION 5 IS INAPPLICABLE TO COMMUNICATIONS TO OR FROM EMPLOYEES ACTING IN A POLITICAL RATHER THAN AN OFFICIAL CAPACITY

DOJ contends that the documents at issue can properly be withheld under FOIA Exemption 5 based on the presidential communications and deliberative process privileges. Def. Mem. at 6-7. Neither privilege is applicable to these e-mail communications.

### A.    The Presidential Communications Privilege Is Inapplicable

The presidential communications privilege is "rooted in the President's 'need for confidentiality in the communications of his office, 'in order to effectively and faithfully carry out his Article II duties and 'to protect 'the effectiveness of the executive decision-making process.'" *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1115 (D.C. Cir. 2004) *quoting In re Sealed Case*, 121 F.3d 729, 742 ((D.C. Cir. 1997). For that reason, the privilege "extends not only to communications directly involving and documents actually viewed by the President, also it applies to communications authored or solicited and received by those immediate White House advisors with 'broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.'" *Loving v. U.S. Dep't of Defense*, 496 F. Supp. 2d 101, 107 (D.D.C. 2007), *quoting In re Sealed Case*, 121 F.3d at 752. However, "the privilege only applies to communications that these advisers and their staff author or solicit and receive in the course of performing their function of advising the President *on official government matters*." *In re Sealed Case*, 121 F.3d at 752 (emphasis added).

As DOJ notes, the e-mails withheld by DOJ on the basis of the presidential communications privilege indeed involve information "authored or solicited and received" by various "White House advisers." Def. Mem. at 9. In imparting or receiving that information, however, those White House advisers chose to use their RNC e-mail accounts which were reserved for communications relating to political activity as distinct from official government business. To be sure, political activity is a legitimate and necessary part of the President's overall activity. But it does not constitute any part of

the President's Article II duties, and political advice provided by his advisors is, by definition, not being given for the purpose of enabling the President to carry out those duties. For that reason, the presidential communications privilege cannot and does not apply to e-mails sent or received on RNC e-mail accounts.

Similarly, the DOJ withheld e-mails regarding meetings of the Judicial Selection Committee, which DOJ states is a "'select group of presidential advisers . . . .'" Def. Mem. at 11 (*quoting* Pustay Decl. ¶40). Those advisers also chose to communicate their views using their RNC e-mail accounts reserved for political activity. Again, to the extent these advisers were providing political advice, such advice was not being given for the purposes of enabling the President to carry out his official, Article II duties and the e-mails were not authored, solicited or received by the advisers "in the course of performing their function of advising the President on official government matters." *In re Sealed Case*, 121 F.3d at 752. For that reason, the presidential communications privilege does not apply to those e-mails, either.

That it is manifestly inappropriate to extend the presidential communications privilege to political e-mails is underscored by the different way in which such e-mails have been treated under the statutory regime governing official records. Under the Presidential Records Act, 44 U.S.C. §§ 2201 *et seq.*, those documents created or received by a unit or individual of the Executive Office of the President are subject to recordkeeping requirements determined by the President himself, rather than to the Federal Records Act, 44 U.S.C. 2101 *et seq. See generally Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1290-93 (D.C. Cir. 1993). While the President has discretion to determine how Presidential records are to be maintained, the statute does

7

require that the President "take all steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory or other official or ceremonial duties are adequately documented . . . and maintained as Presidential records." 44 U.S.C. § 2203(a).

To implement this requirement, "the White House Counsel issued clear written policies in February 2001 instructing White House staff to use only the official White House e-mail system for official communications and to retain any official e-mails they received on a nongovernmental account." House Comm. on Oversight and Gov. Reform, *Interim Report, supra* (Exhibit 2 hereto) at 2. Rightly or wrongly, however, e-mails sent by White House staff members on the RNC e-mail accounts were not preserved as presidential records in accordance with the White House Counsel's directive. According to the House Oversight and Governmental Reform Committee's Interim Report, "it appears that the RNC has destroyed a large volume of the e-mails of White House officials who used RNC e-mail accounts. . . . [T]he RNC has retained no e-mail messages whatsoever for 51 of the 88 White House officials with RNC e-mail accounts." House Comm. on Oversight and Gov. Reform, *Interim Report, supra* (Exhibit 2 hereto) at 4-5.

Whether or not the White House acted properly in failing to treat e-mails sent on the RNC accounts as presidential records is not an issue before this Court. What is clear, however, is that the Government cannot have it both ways. If e-mails sent or received by White House staff on RNC e-mail accounts were *official* communications of White House advisers, protected by the presidential communications privilege, they should have been treated as presidential records and preserved as such. If such e-mails were properly subject to the RNC's own, private document retention policies, under which e-mails

8

could be periodically destroyed, *see Interim Report*, Exhibit 2 hereto, at 4, then clearly such e-mails cannot be treated as official presidential communications to which the presidential communications privilege applies.

In this regard, the issue before the Court is not only important because of the public interest in understanding the nature and extent of political influence over the Office of Attorney General and the other offices. The issue is also one of real practical significance for the DNC. If and when a Democrat is elected President, the DNC will likely be called upon to provide certain resources, including e-mail accounts, to White House staff who may engage, under the Hatch Act, in political activity in their offices and on government time. Regardless of what document retention policy may apply, if such White House staff send communications to other Executive Branch agencies, it is important that the DNC, the White House and the public understand the status of those communications: are they official communications protected as presidential communications or are they political communications not so protected? In the circumstances of this case, it seems clear that such communications must be treated as political communications not subject to the presidential communications privilege.

**B.    The Deliberative Process Privilege Is Inapplicable**

For similar reasons, the deliberative process cannot be invoked as a basis for withholding the subject e-mails under FOIA Exemption 5. "[T]he deliberative process privilege protects confidential intra and inter-agency communications or opinions that are advisory or deliberative in nature." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1123. To be subject to the privilege, a document must be both "pre-decisional" and

9

"deliberative." *Loving*, 496 F. Supp. 2d at 106-07; *see generally, Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

DOJ argues at some length that the e-mails at issue here are "pre-decisional" and "deliberative." Def. Mem. at 14-16. What DOJ fails to address, however, is that these communications are not "intra-agency" or "inter-agency" in the first place. "The point is not to protect Government secrecy pure and simple, . . . and the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra agency.'" *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001). In *Klamath*, the Court held that while in some cases a document prepared outside the Government—such as a report by a consultant—may qualify as an "intra-agency" document under Exemption 5, that applies only to a document "'that has been received by an agency, to assist it in the performance of its own functions, *from a person acting in a governmentally conferred capacity* other than on behalf of another agency—*e.g.*, in a capacity as employee or consultant to the agency. . . .'" *Klamath*, 532 U.S. at 10 (*quoting U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting) (emphasis added)). In *Klamath*, the Court found that communications between Indian Tribes and the Bureau of Indian Affairs were not protected as "intra-agency" or "inter-agency" documents because the Tribes were acting on behalf of themselves, and not on behalf of and to advance the interests of the government agency, in the way an outside  consultant would be acting. 532 U.S. at 11-14.

Here, the White House staff members using their RNC e-mail accounts were, by definition, engaged in political activity and acting as political advisors. They were not, therefore, "acting in a governmentally conferred capacity." They were not providing

10

advice at the request of or to advance the interests of the Department of Justice, the
agency receiving their communications.  Rather, they were, by definition, acting to
advance the interests of the Republican Party and of the President in his capacity as
leader of the Party. For that reason, the deliberative process privilege does not apply.

Recently, in *Nat'l Institute of Military Justice v. U.S. Dep't of Defense*, 2008 U.S.
App. LEXIS 486 (D.C. Cir. 2008), the Court ruled that, notwithstanding *Klamath*,
"documents submitted by non-agency parties in response to an agency's request for
advice are covered by Exemption 5." *Id.* at *12.   In this case, however, the *Vaughn*
index and Pustay Declaration do not establish that communications from those White
House staff using their RNC e-mail accounts were *solicited* by Department of Justice
officials. Further, the White House officials who were acting in a political capacity by
using their RNC e-mail accounts to communicate to the Department of Justice cannot—
as in *Nat'l Inst. for Military Justice*-- be considered to be neutral consultants or even
neutral unpaid experts whose views were being solicited for official use by the agency.
Rather, these White House officials were necessarily representing their own interests—as
advocates for the Republican Party. For this reason, the holding of *Klamath*, rather than
that of *Nat'l Institute of Military Justice*, should apply.

In *Center for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 237 F. Supp.
2d 17 (D.D.C. 2002), decided after *Klamath*, the Court held that documents shared by the
USTR with the Government of Chile during negotiations of a trade agreement were not
"inter-agency" communications covered by Exemption 5.  The Court explained that,
unlike an outside consultant, "Chile is an independent party promoting its own interests,
whose communications with USTR necessarily fall beyond the scope of Exemption 5."

*Id.* at 26. "The critical factor in deciding the inter-agency status of an outside party is the degree of self-interest pursued by that party, as compared to its interest in providing neutral advice or consultation to the agency." *Id.* at 27. In this case, again, by choosing to act in a political capacity in their e-mail communications with the Department of Justice, the White House staff using their RNC e-mail accounts were, by definition, advancing the political interests of the President and/or the political interests of the Republican Party—not providing "neutral advice or consultation" to DOJ. For that reason, the deliberative process privilege does not apply to the e-mails at issue.

## CONCLUSION

For the reasons stated above, plaintiff DNC respectfully requests that the Court deny the DOJ's Motion for Summary Judgment and grant the DNC's Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/ Joseph E. Sandler

_____

Joseph E. Sandler
D.C. Bar # 255919
Elizabeth F. Getman
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E. Suite 1102
Washington, D.C. 20003
Telephone: (202) 479-1111
Fax: (202) 479-1115
e-mail sandler@sandlerreiff.com

Attorneys for Plaintiff
Democratic National Committee

12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. 07-712 (ESH) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| JUSTICE, | ) |
| | ) |
| Defendant | ) |
| | ) |

**PLAINTIFF'S  RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE
AND PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 56.1, plaintiff Democratic National Committee submits

the following response to defendant Department of Justice's Statement of Material Facts

As To Which There Is No Genuine Issue and submits its own statement of additional

material facts as to which there is no genuine dispute.

**Response to Defendant's Statement of Material Facts**

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

5.    Undisputed, except plaintiff is no longer challenging Executive Office of

United States Attorneys' reliance on Exemption 6 as grounds for the

nondisclosure of documents listed in EOUSA's *Vaughn* index.

6.    Sets out conclusion of law.

7.    Sets out conclusion of law.

**Plaintiff's Statement of Additional Material Facts
As To Which There Is No Genuine Issue**

1.    The "GWB43.com" domain name was used for e-mail accounts belonging

to the Republican National Committee.  (U.S. Senate Judiciary Committee, *Hearing on

Preserving Prosecutorial Independence*, 110th Cong., 1st Sess. (Aug. 2, 2007) (excerpts

attached hereto as Exhibit 1)).

2.    At least 88 White House staff members had RNC e-mail accounts at some

point.  (U.S. House of Representatives, Committee on Oversight and Government

Reform, *Interim Report:  Investigation of Possible Presidential Records Act Violations*

(June 2007), attached hereto as Exhibit 2).

3.    The RNC e-mail accounts were supposed to be used by White House staff

for political activity or political business, as distinct from official White House business,

in order to avoid use of government resources for political activity, which would be a

violation of the Hatch Act.  (White House Briefing, April 13, 2007, excerpts attached as

Exhibit 3).

2

Dated: February 14, 2008

Respectfully submitted,


/s/  Joseph E. Sandler
_____

Joseph E. Sandler
D.C. Bar # 255919
Elizabeth F. Getman
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E. Suite 1102
Washington, D.C. 20003
Telephone: (202) 479-1111
Fax: (202) 479-1115
e-mail sandler@sandlerreiff.com

Attorneys for Plaintiff
Democratic National Committee

3

# DEMOCRATIC NATIONAL COMMITTEE

## v.

# U.S. DEPARTMENT OF JUSTICE

# CA 07-712 (ESH)

# EXHIBITS TO
# PLAINTIFF DNC'S MEMORANDUM OF
# POINTS AND AUTHORITIES
# IN SUPPORT OF MOTION FOR
# SUMMARY JUDGMENT AND
# IN OPPOSITION TO DEFENDANT DOJ'S
# MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 1

**LexisNexis**® *Total Research System*                    Switch Client | Preferences | Sign Off | ? Help

*My Lexis*™ �People Search ⚲ Research Tasks ⚲ Get a Document ⚲ *Shepard's*® ⚲ Alerts ⚲ Total Litigator ⚲ Counsel Selector

Source: Legal > Legislation & Politics - U.S. & U.K. > U.S. Congress > Committee Hearing Transcripts > **Federal News Service** ⁱ
Terms: **gwb43.com** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery

*HEARING OF THE SENATE JUDICIARY COMMITTEE; SUBJECT: PRESERVING PROSECUTORIAL INDEPENDENCE: IS THE DEPARTMENT OF JUSTICE POLITICIZING THE HIRING AND FIRING OF U.S. ATTORNEYS? - PART VII; CHAIRED BY: SENATOR PATRICK LEAHY (D-VT); WITNESS: J. SCOTT JENNINGS, SPECIAL ASSISTANT TO THE PRESIDENT AND DEPUTY DIRECTOR OF POLITICAL AFFAIRS; LOCATION: 226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C. Federal News Service August 2, 2007 Thursday*

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

August 2, 2007 Thursday

**SECTION:** CAPITOL HILL HEARING

**LENGTH:** 15527 words

**HEADLINE:** HEARING OF THE SENATE JUDICIARY COMMITTEE;
SUBJECT: PRESERVING PROSECUTORIAL INDEPENDENCE: IS THE DEPARTMENT OF JUSTICE POLITICIZING THE HIRING AND FIRING OF U.S. ATTORNEYS? - PART VII;
CHAIRED BY: SENATOR PATRICK LEAHY (D-VT);
WITNESS: J. SCOTT JENNINGS, SPECIAL ASSISTANT TO THE PRESIDENT AND DEPUTY DIRECTOR OF POLITICAL AFFAIRS;
LOCATION: 226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

HEARING OF THE SENATE JUDICIARY COMMITTEE SUBJECT: PRESERVING PROSECUTORIAL INDEPENDENCE: IS THE DEPARTMENT OF JUSTICE POLITICIZING THE HIRING AND FIRING OF U.S. ATTORNEYS? - PART VII CHAIRED BY: SENATOR PATRICK LEAHY (D-VT) WITNESS: J. SCOTT JENNINGS, SPECIAL ASSISTANT TO THE PRESIDENT AND DEPUTY DIRECTOR OF POLITICAL AFFAIRS LOCATION: 226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C. TIME: 10:08 A.M. EDT DATE: THURSDAY, AUGUST 2, 2007

SEN. LEAHY: (Strikes gavel.) Good morning.

Today the committee welcomes Scott Jennings, who's a special assistant to the president. He's deputy director of Political Affairs. He's accompanied by his attorney, Mark Paoletta, whom the committee has permitted to be seated with Mr. Jennings at the witness table, to provide him with counsel.

Mr. Jennings, through his attorney, has informed the committee he'll refuse to answer questions falling within the president's blanket claim of executive privilege. As I've told Mr. Jennings earlier this morning, I consider that blanket claim to be unsubstantiated.

MR. JENNINGS: Yes, sir.

SEN. LEAHY: I give you a copy of a document numbered OAG112-113. This is a June 22 `06 e-mail exchange between you and Monica Goodling. Are you familiar with that document?

MR. JENNINGS: I have seen this document.

SEN. LEAHY: And that's what it is, an-e-mail exchange between you and Monica Goodling?

MR. JENNINGS: It is an e-mail.

SEN. LEAHY: Mr. Jennings, I'm not here to play games. I'm trying to be fair to you.

Is this an e-mail exchange between you and Monica Goodling?

MR. JENNINGS: Yes, sir.

SEN. LEAHY: Thank you.

The second to last e-mail in the string is an e-mail to Ms. Goodling from an e-mail address, sjennings@**gwb43.com.** Is that your Republican National Committee e-mail address?

MR. JENNINGS: It was an e-mail address, and that particular e- mail address was ascribed to me in the past. It's no longer my Republican National Committee e-mail address.

SEN. LEAHY: Do you have a Republican National Committee e-mail address now?

MR. JENNINGS: Yes, sir.

SEN. LEAHY: And what is that?

MR. JENNINGS: It is jsj@**gwb43.com.**

SEN. LEAHY: Why do you no longer have the other one?

MR. JENNINGS: Sir, after the e-mail address that is on this page was published in various places on the Internet and other places, I received a significant amount of junk, spam and otherwise what might be considered as hate e-mail, and so for those reasons, it was becoming overloaded, and we determined to change it so it wouldn't have to deal with that.

SEN. LEAHY: At the bottom of the e-mail, you have as a signature, it says, "J. Scott Jennings, Special Assistant to the President, Deputy Political Director of the White House." The e-mail address listed in your signature with your official White House title is "sjennings@**gwb43.com.**" Is that correct?

MR. JENNINGS: Yes, sir.

SEN. LEAHY: How frequently did you use this e-mail address?

MR. JENNINGS: It -- I believe I've seen published accounts that have several thousand e-mails on an active server at the RNC, so it's fair to say that I used it daily.

SEN. LEAHY: And would the "thousands" that are referred to, would you think those are correct?

MR. JENNINGS: Yes, sir. I have no reason to believe it's not.

SEN. LEAHY: The report said that they received over 35,000 e- mails of which you a part. Does that seem out of line?

MR. JENNINGS: I think that the number is probably accurate. And I think that if you look at it in context, much of the e-mail that I received was of a bulk nature -- press clippings, news releases and other junk e-mail. So I think that while it's a little inflated, I have no reason to believe the number is not accurate.

SEN. LEAHY: Why'd you send these e-mails setting up a conference call regarding Tim Griffin, later installed by the attorney general as an interim U.S. attorney to replace Bud Cummins in the Eastern District of Arkansas? Why'd you send that from your RNC e-mail account?

MR. JENNINGS: Senator, pursuant to the president's assertion of executive privilege over consideration, deliberations or communications related to the U.S. attorneys matter, I must respectfully decline to answer your question at this time.

SEN. LEAHY: So, the new way of taking the Fifth. But let me ask you this. This is not -- I'm not asking you about something where you communicated with the president. This is a Republican National Committee e-mail; I'm asking you why -- not what you sent or anything else -- but why did you use this?

MR. JENNINGS: May I have a moment, Senator, to confer?

SEN. LEAHY: Of course. Confer with your attorney.

(Pause.)

MR. JENNINGS: I understand your question, Senator. I apologize. I want to answer it. I think it might be helpful to give a --

SEN. LEAHY: I thought you might. Go ahead.

MR. JENNINGS: Yes, sir. I think it might be helpful to give a little context about the use of the e-mail accounts. I have -- I came to the White House, as you said, in 2005, and when I came, I was given two e-mail accounts, as you know, and devices such as a BlackBerry and a laptop that were connected to my RNC e-mail account, and only one device, a computer desktop, connected to my official account. So over the course of time, it became efficient and crucial for me to be able to respond to communications in a 24/7 manner.

SEN. LEAHY: But here we're talking about official business. It's regarding Tim Griffin, later installed by the attorney general as an interim U.S. attorney, replacing another U.S. attorney. Why would you use a Republican National Committee account rather than your official account? Wouldn't this be official business?

MR. JENNINGS: Senator, I understand your question. I would also like to say that it's my understanding that out of an abundance of caution and to avoid possible Hatch Act violations -- that's why we were issued these accounts.

And over the course of time --

SEN. LEAHY: Do you feel this was a Hatch Act violation, setting up this kind of a meeting?

MR. JENNINGS: No, sir.

SEN. LEAHY: Then why did you use it?

MR. JENNINGS: As I said, Senator, I would like to give some context about the e-mail accounts. Over the course of time, the use of the Republican National Committee e-mail account became a matter of convenience and efficiency, because I had access to it 24 hours a day, 7 days a week, unlike my other e-mail account. And so --

SEN. LEAHY: Were there other occasions which you used an RNC e- mail account in connection with the development of plans to replace U.S. attorneys or the implementation of these plans or even the explanation of these plans?

MR. JENNINGS: Can you repeat the question, sir?

SEN. LEAHY: Were there other occasions which you used an RNC e- mail account in connection with the development of plans to replace U.S. attorneys?

MR. JENNINGS: Senator, I used my RNC account for many matters, including that.

SEN. LEAHY: Since the 2004 election, did you speak with President Bush about replacing U.S. attorneys?

MR. JENNINGS: Senator, pursuant to the president's assertion of executive privilege, I must respectfully decline to answer your question at this time.

SEN. LEAHY: I'm not asking you what was said. Did you speak with him about these at all?

MR. JENNINGS: Senator, I understand and I've been --

SEN. LEAHY: Did you attend any meeting with the president since the 2004 election which removal and replacement of U.S. attorneys was discussed.

MR. JENNINGS: Senator, pursuant to the president's assertion of executive privilege, I must respectfully decline to answer your questions.

SEN. LEAHY: Are you aware of any presidential decision document since the 2004 election which President Bush decided to proceed with a replacement plan for U.S. attorneys?

MR. JENNINGS: Senator, pursuant to the president's assertion of executive privilege, I respectfully decline to answer at this time.

SEN. LEAHY: As special assistant to the president and deputy director of Political Affairs, what role do you have in the selection of nominees to be U.S. attorneys?

MR. JENNINGS: Senator, I will decline to answer that question pursuant to the president's assertion of executive privilege.

SEN. LEAHY: Whoa, whoa, whoa, whoa, wait a minute. I'm just asking what role you have in the selection of nominees to be U.S. attorney. I'm just talking about what you do. Now I mean, let's not be too contemptuous of this committee. I'm just asking you, what role do you have in the selection of nominees to be U.S. attorneys?

You work at the White House. You're paid for by taxpayers. You work for the American people. I'm just asking you what kind of work you do.

MR. JENNINGS: Sir, I understand. And based on my understanding of the letter I have from Mr. Fielding, this falls under the president's assertion of executive privilege, and therefore I must respectfully decline to answer at this time.

# EXHIBIT 2



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM
MAJORITY STAFF
JUNE 2007

Interim Report

# INVESTIGATION OF POSSIBLE PRESIDENTIAL RECORDS ACT VIOLATIONS

PREPARED FOR
CHAIRMAN HENRY A. WAXMAN

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ...........................................................i

I.    BACKGROUND ............................................................ 1

II.   WHITE HOUSE OFFICIALS WITH RNC E-MAIL
      ACCOUNTS ................................................................ 2

III.  USE OF THE RNC ACCOUNTS BY WHITE HOUSE
      OFFICIALS ................................................................. 3

IV.   DESTRUCTION OF THE E-MAILS OF WHITE HOUSE
      OFFICIALS ................................................................. 4

V.    WHITE HOUSE COUNSEL POLICIES AND
      KNOWLEDGE REGARDING THE USE OF
      RNC E-MAIL ACCOUNTS ........................................... 7

VI.   CONCLUSION.............................................................. 8

ATTACHMENT I:  LIST OF WHITE HOUSE OFFICIALS
WHO HELD RNC ACCOUNTS........................................... 10

ATTACHMENT II:  DATA REGARDING E-MAILS
PRESERVED BY THE RNC.................................................. 11

# EXECUTIVE SUMMARY

The Oversight Committee has been investigating whether White House officials violated the Presidential Records Act by using e-mail accounts maintained by the Republican National Committee and the Bush Cheney '04 campaign for official White House communications. This interim staff report provides a summary of the evidence the Committee has received to date, along with recommendations for next steps in the investigation.

The information the Committee has received in the investigation reveals:

- **The number of White House officials given RNC e-mail accounts is higher than previously disclosed.** In March 2007, White House spokesperson Dana Perino said that only a "handful of officials" had RNC e-mail accounts. In later statements, her estimate rose to "50 over the course of the administration." In fact, the Committee has learned from the RNC that at least 88 White House officials had RNC e-mail accounts. The officials with RNC e-mail accounts include Karl Rove, the President's senior advisor; Andrew Card, the former White House Chief of Staff; Ken Mehlman, the former White House Director of Political Affairs; and many other officials in the Office of Political Affairs, the Office of Communications, and the Office of the Vice President.

- **White House officials made extensive use of their RNC e-mail accounts.** The RNC has preserved 140,216 e-mails sent or received by Karl Rove. Over half of these e-mails (75,374) were sent to or received from individuals using official ".gov" e-mail accounts. Other heavy users of RNC e-mail accounts include former White House Director of Political Affairs Sara Taylor (66,018 e-mails) and Deputy Director of Political Affairs Scott Jennings (35,198 e-mails). These e-mail accounts were used by White House officials for official purposes, such as communicating with federal agencies about federal appointments and policies.

- **There has been extensive destruction of the e-mails of White House officials by the RNC.** Of the 88 White House officials who received RNC e-mail accounts, the RNC has preserved no e-mails for 51 officials. In a deposition, Susan Ralston, Mr. Rove's former executive assistant, testified that many of the White House officials for whom the RNC has no e-mail records were regular users of their RNC e-mail accounts. Although the RNC has preserved no e-mail records for Ken Mehlman, the former Director of Political Affairs, Ms. Ralston testified that Mr. Mehlman used his account "frequently, daily." In addition, there are major gaps in the e-mail records of the 37 White House officials for whom the RNC did preserve e-mails. The RNC has preserved only 130 e-mails sent to Mr. Rove during President Bush's first term and no e-mails sent by Mr. Rove prior to November 2003. For many other White House officials, the RNC has no e-mails from before the fall of 2006.

- **There is evidence that the Office of White House Counsel under Alberto Gonzales may have known that White House officials were using RNC e-mail accounts for official business, but took no action to preserve these presidential records.** In her deposition, Ms. Ralston testified that she searched Mr. Rove's RNC e-mail account in response to an Enron-related investigation in 2001 and the investigation of Special Prosecutor Patrick Fitzgerald later in the Administration. According to Ms. Ralston, the White House Counsel's office knew about these e-mails because "all of the documents we collected were then turned over to the White House Counsel's office." There is no evidence, however, that White House Counsel Gonzales initiated any action to ensure the preservation of the e-mail records that were destroyed by the RNC.

The Presidential Records Act requires the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented ... and maintained as Presidential records." To implement this legal requirement, the White House Counsel issued clear written policies in February 2001 instructing White House staff to use only the official White House e-mail system for official communications and to retain any official e-mails they received on a nongovernmental account.

The evidence obtained by the Committee indicates that White House officials used their RNC e-mail accounts in a manner that circumvented these requirements. At this point in the investigation, it is not possible to determine precisely how many presidential records may have been destroyed by the RNC. Given the heavy reliance by White House officials on RNC e-mail accounts, the high rank of the White House officials involved, and the large quantity of missing e-mails, the potential violation of the Presidential Records Act may be extensive.

There are several next steps that should be pursued in the investigation into the use of RNC e-mail accounts by White House officials. First, the records of federal agencies should be examined to assess whether they may contain some of the White House e-mails that have been destroyed by the RNC. The Committee has already written to 25 federal agencies to inquire about the e-mail records they may have retained from White House officials who used RNC and Bush Cheney '04 e-mail accounts. Preliminary responses from the agencies indicate that they may have preserved official communications that were destroyed by the RNC.

Second, the Committee should investigate what former White House Counsel Alberto Gonzales knew about the use of political e-mail accounts by White House officials. If Susan Ralston's testimony to the Committee is accurate, there is evidence that Mr. Gonzales or counsels working in his office knew in 2001 that Karl Rove was using his RNC e-mail account to communicate about official business, but took no action to preserve Mr. Rove's official communications.

Third, the Committee may need to issue compulsory process to obtain the cooperation of the Bush Cheney '04 campaign. The campaign has informed the Committee that it provided e-mail accounts to 11 White House officials, but the campaign has unjustifiably refused to provide the Committee with basic information about these accounts, such as the identity of the White House officials and the number of e-mails that have been preserved.

# I.    BACKGROUND

The Oversight Committee first learned that White House officials might be using RNC e-mail accounts to avoid leaving a record of official communications during the Committee's investigation last year into White House contacts with convicted lobbyist Jack Abramoff.  That investigation revealed that Susan Ralston regularly communicated with Mr. Abramoff regarding federal agency decisions, political appointments, and other official business on nongovernmental accounts.  In one e-mail, Ms. Ralston wrote Mr. Abramoff's associate Todd Boulanger:  "I now have an RNC blackberry which you can use to e-mail me at any time.  No security issues like my WH e-mail."[1]  In another e-mail, Mr. Abramoff was informed by an associate that a White House staff member advised the lobbyist not to send communications through the official White House e-mail system because "to put this stuff in writing in their e-mail system ... might actually limit what they can do to help us."[2]

Additional evidence that White House officials have used RNC e-mail accounts for official communications arose as part of two other investigations:  (1) the investigation by the Senate and House Judiciary Committees into the firings of U.S. Attorneys and (2) the investigation by the Oversight Committee into White House political presentations to federal agencies.  One e-mail sent through the RNC account of the assistant to Scott Jennings, Karl Rove's deputy, transmitted a political presentation to the General Services Administration, advising:  "It is a close hold and we're not supposed to be emailing it around."[3]

On March 26, 2007, the Oversight Committee sent a letter to the RNC and the Bush Cheney '04 campaign asking both entities to preserve all records of e-mails sent to or from White House officials.[4]  On April 4, 2007, the Committee wrote again to the RNC and the Bush Cheney '04 campaign requesting e-mails relating to political briefings provided to agency officials and the use of federal agencies and federal resources for partisan political purposes.[5]  When the RNC failed to cooperate voluntarily, the Committee issued two subpoenas to the RNC on April 25, 2007.  These subpoenas sought statistical information about White House officials' use of the accounts as well as the e-mails that had previously been requested.

In response to the Committee's first subpoena, the RNC has provided the Committee with a list of White House officials who held RNC accounts as well as information about the total number of e-mails preserved by the RNC for each of these officials, the number of e-mails preserved for each official on a daily basis, and the number of e-mails preserved that were sent to or from federal ".gov" e-mail accounts.

---

[1]  E-mail from Susan Ralston to Shawn Vasell and Todd Boulanger (July 11, 2001) (GTG-R001392).

[2]  E-mail from Kevin Ring to Jack Abramoff (Feb. 7, 2003) (GTG-R002245).

[3]  E-mail from Jocelyn Webster to Tessa Truesdell (Jan. 19, 2007) (W-02-0310).

[4]  Letter from Rep. Henry A. Waxman to Mike Duncan, Chairman, Republican National Committee (Mar. 26, 2007); Letter from Rep. Henry A. Waxman to Marc Racicot, former Chairman, Bush Cheney '04 (Mar. 26, 2007).

[5]  Letter from Rep. Henry A. Waxman to Mike Duncan, Chairman, Republican National Committee (Apr. 4, 2007); Letter from Rep. Henry A. Waxman to Marc Racicot, former Chairman, Bush Cheney '04 (Apr. 4, 2007).

The Committee obtained additional information about the use of RNC accounts by White House officials when the Committee deposed Susan Ralston on May 10, 2007. In addition, the White House has provided the Committee with redacted policies and memoranda relating to e-mail use and preservation. Several federal agencies have also provided the Committee with partial inventories of e-mail communications with White House officials who used RNC and Bush Cheney '04 e-mail accounts.

## II.   WHITE HOUSE OFFICIALS WITH RNC E-MAIL ACCOUNTS

The RNC has identified 88 current and former White House officials who held RNC e-mail accounts while on staff at the White House, as well as one account that was held by an unnamed intern or interns in the Office of Political Affairs. This is a larger number than previously acknowledged by the White House. On March 27, 2007, when White House spokesperson Dana Perino was first asked about the use of political e-mail accounts by White House officials, she stated that only a "handful of officials" had access to these accounts.[6] In later statements, Ms. Perino said that the total set of account holders was "50 over the course of the administration."[7]

The list of White House officials who held these accounts include Karl Rove, the President's senior advisor; Andrew Card, the former White House Chief of Staff; and Dan Bartlett, the Counselor to the President. The list also includes all four Directors of Political Affairs that have served in the Bush White House: Ken Mehlman (2001-2003), Matt Schlapp (2003-2005), Sara Taylor (2005-2007), and Jonathan Felts (2007), the newly named Director of Political Affairs who previously worked for Vice President Cheney. Many of the account holders worked under Karl Rove in the Office of Political Affairs or the Office of Strategic Initiatives. Others worked in the Office of Communications or the Office of the Vice President. Individuals from the Vice President's office with RNC e-mail accounts include Mel Raines and Kara Ahern, both of whom served as Political Director for the Vice President. Appendix 1 contains the complete list of White House officials who were provided with RNC e-mail accounts.

The Bush Cheney '04 campaign has provided only limited information to the Committee about White House officials who held campaign e-mails accounts. According to the campaign, 11 officials were provided with Bush Cheney '04 campaign accounts. The campaign has identified only six of the account holders, including Dan Bartlett and Karl Rove, all of whom also held RNC accounts.[8]

---

[6] The White House, *Press Briefing by Dana Perino* (Mar. 27, 2007).
[7] The White House, *Press Briefing by Dana Perino* (Apr. 12, 2007).
[8] Letter from Eric A. Kuwana, Katten Muchin Rosenman, to Rep. Henry A. Waxman (May 15, 2007).

## III.  USE OF THE RNC ACCOUNTS BY WHITE HOUSE OFFICIALS

Although 88 White House officials received RNC e-mail accounts, the RNC says that it retains e-mail records for only 37 of these officials.  For these 37 officials and the unnamed intern in the Office of Political Affairs, the RNC has preserved 674,367 e-mails sent to and from their RNC-maintained accounts.  Usage patterns documented by the RNC show that these accounts were used by White House officials on a regular and consistent basis.[9]  A list of the 37 officials for whom the RNC provided data, along with the number of e-mails sent and received by each of these officials, is contained in Appendix 2.

According to the data provided to the Committee, the RNC has preserved 140,216 e-mails sent to and from Mr. Rove's RNC e-mail account between January 2002 and April 2007, the most of any White House official.  The second most prolific user of the RNC account was Sara Taylor, the former White House Director of Political Affairs.  The RNC has preserved 66,018 of her e-mails.  Ten other users have more than 20,000 e-mails preserved by the RNC.  These include Jane Cherry (27,482), Raul Damas (38,034), Melissa Danforth (38,802), Paris Dennard (33,370), Michael Ellis (22,004), Jonathan Felts (29,011), Scott Jennings (35,198), Mindy McLaughlin (23,346), Susan Ralston (35,665), and Steven Soper (33,382).[10]

Some officials relied heavily on these accounts, sending and receiving many e-mails each day.  According to the data provided to the Committee, two account holders averaged more than 200 e-mails each weekday.  The RNC has e-mail records for Brad Smith, an executive assistant in the Office of Political Affairs, for the period between January 10, 2007, and April 27, 2007.  During this period, Mr. Smith sent 6,954 e-mails and received 9,812 e-mails, for an average of 217 per weekday.  Steven Soper, an associate director of the Office of Political Affairs, was another frequent user with 33,382 e-mails sent and received in the eight months between September 2006 and April 2007, an average of 202 per weekday.

Mr. Rove and six other White House officials — Mike Britt, Jonathan Felts, Korinne Kubenna, Mindy McLaughlin, Cliff Rosenberger, and Nick Sinatra — all averaged more than 100 e-mails sent or received each weekday that their accounts were active.[11]  In 2007, Mr. Rove frequently sent more than 100 e-mails per day through his RNC e-mail account and received more than 200 per day.

---

[9] The RNC provided the Committee with data on all e-mail preserved by the RNC for each account holder, but appears not to have limited this data to dates when these individuals were on the White House payroll. This may skew the results slightly for some individuals, as it appears that some White House officials continued to receive, and occasionally send, e-mails from these accounts after they left the White House.

[10] Jane Cherry is an associate director in the Office of Political Affairs; Raul Damas and Steven Soper both held this position in the past; Paris Dennard is an executive assistant in the Office of Political Affairs; Cliff Rosenberger was a staff assistant in the Office of Political Affairs; Melissa Danforth and Michael Ellis are former associate directors in the Office of Strategic Initiatives; and Mindy McLaughlin is the associate director of scheduling.

[11] Korinne Kubenna and Nick Sinatra are associate directors in the Office of Political Affairs.

The Committee asked the RNC to provide data on how many e-mails each White House official sent to or received from official ".gov" e-mail accounts. According to the information from the RNC, virtually all of the 37 White House officials used their RNC accounts to communicate with government officials with official ".gov" e-mail accounts. Of the 674,367 e-mails preserved by the RNC, 240,922 e-mails (36%) were sent to or received from government e-mail accounts. Four White House officials — Karl Rove, Jason Huntsberry, Melissa Danforth, and Emily Willeford — conducted more than half of their communications on their RNC accounts with government officials who were using official ".gov" accounts.[12]  Mr. Rove alone sent or received 75,374 ".gov" e-mails using his RNC e-mail account.

In response to the request from the Committee, a few agencies have provided partial inventories of e-mails exchanged between agency officials and White House officials using RNC and Bush Cheney '04 e-mail accounts.  These limited inventories indicate that White House officials used their RNC e-mail accounts to conduct official business.  For example, the inventories provided by the Environmental Protection Agency, the Department of Transportation, and the Federal Elections Commission all list numerous e-mails that involve official appointments and other personnel matters.[13]  The EPA inventory includes several e-mail exchanges about "EPA Grants" and "grant announcements," as well as e-mails about a "watershed project."

The inventory the Committee received from the General Services Administration includes several e-mail exchanges between GSA officials and Jane Cherry in the White House Office of Political Affairs regarding an "African Burial Ground."  This e-mail exchange occurred in the weeks before the GSA held a ceremonial groundbreaking in September 2005 in New York City for a memorial at the African Burial Ground National Landmark Site.  The GSA inventory also lists several e-mails in February 2007 between Scott Jennings in the Office of Political Affairs and a GSA official regarding a "San Francisco Fed Building Opening."

## IV.  DESTRUCTION OF THE E-MAILS OF WHITE HOUSE OFFICIALS

Whether intentionally or inadvertently, it appears that the RNC has destroyed a large volume of the e-mails of White House officials who used RNC e-mail accounts.  The RNC has told the Committee that it had a "document retention" policy under which e-mails that are more than 30 days old are deleted.  In addition, the RNC has said that individual account holders had the ability to delete permanently e-mails less than 30 days

---

[12] Jason Huntsberry is a former associate director in the Office of Political Affairs and Emily Willeford is the director of Karl Rove's office.

[13] These include e-mails about "regional openings" at EPA, an "FEC job candidate," and numerous e-mails that are listed as being "personnel related" at the Department of Transportation.

old. As a result of these policies, potentially hundreds of thousands of White House e-mails have been destroyed, many of which may be presidential records.

One indication of the scale of the loss of White House e-mail is the fact that the RNC has retained no e-mail messages whatsoever for 51 of the 88 White House officials with RNC e-mail accounts. It is possible that some of these individuals made minimal or no use of their accounts, but there is evidence that indicates that many of them used their accounts on a regular basis.

The Oversight Committee took the deposition of Susan Ralston, Karl Rove's former executive assistant, on May 10, 2007. At the time of the deposition, the Committee had been informed by the RNC of 36 White House officials who had RNC accounts but for whom the RNC had no e-mail records. Ms. Ralston testified that at least 20 of these officials used their RNC e-mail accounts, often regularly. Of the remaining 16 officials, Ms. Ralston testified that she did not know whether they used their accounts or not.[14]

During the deposition, Ms. Ralston was asked about the e-mail practices of Ken Mehlman, the former White House Political Director. Ms. Ralston testified that Mr. Mehlman used his e-mail account "frequently, daily."[15] The RNC, however, has not retained a single e-mail to or from Mr. Mehlman during his period as White House Political Director. Ms. Ralston testified that Israel Hernandez, a former assistant to Mr. Rove, used his RNC account "regularly," but the RNC has no record of any e-mails sent by Mr. Hernandez from his RNC account. Ms. Ralston stated that several officials who served in the White House Office of Political Affairs — among them Paul Dyck, Angela Flood, Leonard Rodriguez, Alicia Davis, and Mike Davis — all held RNC accounts that she believed were used "daily" or "regularly."[16] The RNC has not retained a single e-mail to or from any of these officials.

Moreover, even for White House officials for whom the RNC has e-mail records, these records appear to be incomplete. Of the 37 officials for whom the RNC has retained e-mails, only 15 have any e-mail records that date from before 2006. Of those, seven have virtually no e-mails dating to those earlier years. The RNC has reported that the first available e-mail for Scott Jennings is dated January 1, 2003. However, the RNC has only preserved four of Mr. Jennings's e-mails dated earlier than August 2006. In contrast, the RNC has over 35,000 e-mails sent and received by Mr. Jennings during the nine months between August 2006 and April 2007.

An analysis of Karl Rove's e-mail records shows major gaps in the preservation of his e-mails. According to Susan Ralston, who began working for Karl Rove in February 2001, Mr. Rove used his political e-mail account frequently during the entire period that she worked for him. She told the Committee that he used this account many times per day.[17] Yet the RNC has preserved only 130 e-mails sent to Mr. Rove during the entire first term

---

[14] Deposition of Susan Ralston by the Committee on Oversight and Government Reform (May 10, 2007).

[15] Id.

[16] Id.

[17] Id.

of the Bush Administration.  The first e-mail sent by Mr. Rove that the RNC has preserved is dated November 26, 2003.

Mr. Rove has frequently been described in the media as a constant Blackberry user whose "BlackBerry has every appearance of being surgically attached to his hand."[18]  A 2002 article about technology in the White House noted:  "Even before the BlackBerry passed its recent technology review, Karl Rove, the president's chief political strategist, was an early adopter at the White House."[19]  According to Ms. Ralston's testimony, the only Blackberry Mr. Rove used was one issued to him by the RNC.[20]  If this is true, few of Mr. Rove's Blackberry e-mail communications from President Bush's first term have been preserved by the White House or the RNC.

During her deposition, Ms. Ralston told the Committee that her "general understanding was that [Mr. Rove] thought that the e-mails were being preserved."[21]  She stated that "during the first four years or so," when Mr. Rove's computer equipment was upgraded or his Blackberry was replaced, RNC staff explained that "because they saved Karl's e-mails, that it would take a long time to load up his e-mail file folders."[22]  The Committee has received no explanation for the discrepancy between Ms. Ralston's belief that Mr. Rove's e-mails were being preserved by the RNC and the RNC's assertions to the Committee that the RNC has virtually no e-mails from Mr. Rove for the President's first years in office.

The partial e-mail inventories provided to the Committee by federal agencies provide a further indication that official records may have been lost.  As discussed in the previous section, the General Services Administration provided the Committee with a summary of September 2005 e-mails between Jane Cherry at the White House and a GSA official regarding an African Burial Ground.  According to the RNC, however, the earliest e-mail preserved by the RNC on Ms. Cherry's account is from December 2005.

Like the RNC, the Bush Cheney '04 campaign has told the Committee that it had a 30-day deletion policy, which creates the possibility that the campaign also destroyed an extensive volume of White House e-mails.  The extent to which the Bush Cheney '04 campaign destroyed or preserved the e-mails cannot be assessed by the Committee, however, because the campaign has refused to provide the Committee with statistics about e-mail usage and retention.

---

[18] *The Rove Warrior*, Time (Dec. 27, 2004).
[19] *He Used to be G94B*, Newsweek (Oct. 14, 2002).
[20] Deposition of Susan Ralston by the Committee on Oversight and Government Reform (May 10, 2007).
[21] *Id.*
[22] *Id.*

## V.    WHITE HOUSE COUNSEL POLICIES AND KNOWLEDGE REGARDING THE USE OF RNC E-MAIL ACCOUNTS

When concerns were first raised publicly about the use of RNC e-mail accounts by White House officials, the White House stated that the problems arose, in large part, from a lack of clear guidance from the White House regarding the handling of e-mail and the separation of official and political work.[23]  According to White House spokesperson Dana Perino, the White House implemented a new e-mail policy this year because the existing "policy wasn't very clear, and that people needed a clearer policy."[24]

In fact, the White House policy from the first days of the Bush Administration has been clear:  use only the official e-mail system for official communications and retain any official e-mails received on a nongovernmental account.  A February 26, 2001, memorandum from Alberto Gonzales, Counsel to the President, to White House staff stated:

> e-mail is no different from other kinds of documents.  Any e-mail relating to official business therefore qualifies as a Presidential record.  All e-mail to your official e-mail address is automatically archived as if it were a Presidential record, and all e-mail from your official e-mail address is treated as a Presidential record unless you designate otherwise. ... [I]f you happen to receive an e-mail on a personal e-mail account that otherwise qualifies as a Presidential record, it is your duty to ensure that it is preserved and filed as such by printing it out and saving it or by forwarding it to your White House e-mail account.[25]

The February 2001 White House Staff Manual similarly stated:

> Federal law and EOP policy require the preservation of electronic communications that relate to official business and that are sent or received by EOP staff.  As a result, you must only use the authorized e-mail system for all official electronic communications.[26]

Ms. Ralston's deposition provides evidence that the White House Counsel's office under Alberto Gonzales may have been aware as early as 2001 that White House officials were not complying with the policies regarding preservation of official e-mail.  Ms. Ralston told the Committee that she and Mr. Rove twice searched for e-mails on his political accounts in response to investigative requests.  Ms. Ralston stated that in 2001, Mr. Rove was asked to search his political computer in response to a request relating to an

---

[23] See Bush Aides' Use of GOP Email Probed, The Associated Press (Apr. 11, 2007).

[24] The White House, Press Briefing by Dana Perino (Apr. 13, 2007).

[25] Memorandum from Alberto Gonzales, Counsel to the President (Feb. 26, 2001) included within The White House, White House Staff Manual (Feb. 2001) (redacted copy provided to Committee on Oversight and Government Reform).

[26] The White House, White House Staff Manual (Feb. 2001) (redacted copy provided to Committee on Oversight and Government Reform).

investigation of Enron. She testified that the White House Counsel's office would have known about these searches "because all of the documents that we collected were then turned over to the White House Counsel's office."[27] According to Ms. Ralston, this investigation was related to the Vice President's energy task force and contacts with Enron.[28]

In addition, Ms. Ralston testified that Mr. Rove searched his RNC e-mail account in response to several subpoenas from Patrick Fitzgerald during the investigation of the leak of the identity of CIA officer Valerie Plame Wilson. She testified that the White House Counsel's office also knew about these searches and received copies of the search results.[29]

Ms. Ralston's testimony about these searches raises several questions. If her testimony is accurate, former White House Counsel Gonzales may have been aware in 2001 that Mr. Rove was using RNC e-mail accounts for official communications. Yet it was not until six years later that the White House wrote to the RNC instructing it to preserve any "emails or documents that may relate to the official business of the Executive Office of the President that may be in the possession of the RNC."[30]

# VI.  CONCLUSION

The Presidential Records Act was enacted in 1978 to ensure that White House records are preserved and made available to the public and historians. The Act establishes that the records of a president, his immediate staff, and certain units of the Executive Office of the President belong to the United States, not to the individual president or his staff. The law provides:

> the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law.[31]

---

[27] Deposition of Susan Ralston by the Committee on Oversight and Government Reform (May 10, 2007).
[28] Phone call between Susan Ralston and Committee on Oversight and Government Reform Committee staff (May 18, 2007).
[29] Deposition of Susan Ralston by the Committee on Oversight and Government Reform (May 10, 2007).
[30] Letter from Emmet T. Flood, Special Counsel to the President, to Tom Josefiak, Republican National Committee (Mar. 14, 2007).
[31] 44 U.S.C. § 2203.

The Committee has obtained evidence of potentially extensive violations of the Presidential Records Act by senior White House officials. During President Bush's first term, momentous decisions were made, such as the decision to go to war in Iraq. Yet many e-mail communications during this period involving the President's most senior advisors, including Karl Rove, were destroyed by the RNC. These violations could be the most serious breach of the Presidential Records Act in the 30-year history of the law.

There are three next steps in the Committee's investigation. First, the Committee will continue its efforts to survey federal agencies for the missing presidential records. The Committee has written 25 agencies to request inventories of e-mails with White House officials using RNC and Bush Cheney '04 e-mail accounts that the agencies may retain. The data received from the RNC will allow the Committee and the agencies to target their efforts upon officials and periods of time for which the RNC appears to have destroyed its e-mail records.

Second, the Committee will seek additional information about the White House role in the failure to preserve these e-mails, especially the role of former White House Counsel Alberto Gonzales. Mr. Gonzales issued the right policies in February 2001, but failed to enforce them. Moreover, Ms. Ralston's testimony provides evidence that Mr. Gonzales or others in the White House Counsel's office may have failed to act even after receiving information about Mr. Rove's use of the RNC accounts for official communications.

Finally, the Committee may need to issue compulsory process to the Bush Cheney '04 campaign. The campaign acknowledges that at least 11 White House officials used campaign e-mails, but it refuses to identify the full list of officials or provide basic statistical information to the Committee. This recalcitrance is an unwarranted obstacle to the Committee's inquiry into potential violations of the Presidential Records Act.

# ATTACHMENT I:  LIST OF WHITE HOUSE OFFICIALS WHO HELD RNC ACCOUNTS

| | | | |
|---|---|---|---|
| Ahern, Kara | Fricks, Wesley | Marinis, Kate | Sforza, Scott |
| Bartlett, Dan | Garcia, Noe | Martin, Cathie | Shannon, Michael |
| Bearson, Darren | Goergen, BJ | Mayol, Annie | Simmons, Sarah |
| Becker, Glynda | Gray, Adrian | McBride, Anita | Sinatra, Nick |
| Best, Trey | Griffin, Tim | McBrien, Lauren | Smith, Brad |
| Britt, Mike | Henick, Chris | McCullough, Kelley | Soper, Steven |
| Card, Andrew | Hernandez, Israel | McLaughlin, Mindy | Swineheart, Jessica |
| Casale, Anthony AJ | Hester, Brad | McMahan, Thomas | Taylor, Sara |
| Cherry, Jane | Hoelscher, Doug | Mehlman, Ken | Terpeluk, Meredith |
| Clark, Alicia | Hollifields, Nathan | Napolitano, Michael | Thomas, Dave |
| Clyne, Megan | Hughes, Karen | Oschal, Jennifer | Thomas, Travis |
| Damas, Raul | Hughes, Taylor | Palasciano, Kristen | Thompson, Nicholas |
| Danforth, Melissa | Hunter, Matt | Pipes, Kasey | Wallace, Nicolle |
| Davis, Alicia | Huntsberry, Jason | Raad, Lori | Webster, Jocelyn |
| Davis, Mike | Jackson, Barry | Raines, Mel | Wehner, Peter |
| Dennard, Paris | Jennings, Scott | Ralston, Susan | Westine, Lezlee |
| Dyck, Paul | Johnson, Collister | Ritacco, Krista | Willeford, Emily |
| Elliott, Bridget | Jucas, Tracy | Rodriguez, Leonard | Wilson-Lawson, Lauren |
| Ellis, Michael | Kubena, Korinne | Rosenberger, Cliff | Zimmerman, Neil |
| Eskew, Carter | Lauckhardt, Shelby | Rove, Karl | OPA Intern |
| Felts, Jonathan | Levine, Adam | Schlapp, Matt | |
| Flood, Angela | MacIntyre, Henley | Schmidt, Steve | |
| Frans, Luke | Mamo, Jeanie | Seaton, Jon | |

Source:  Letter from Robert K. Kelner to Rep. Henry A. Waxman (Apr. 25, 2007); Letter from Robert K. Kelner to Rep. Henry A. Waxman (May 8, 2007); Letter from Robert K. Kelner to Rep. Henry A. Waxman (May 30, 2007).

# ATTACHMENT II: DATA REGARDING E-MAILS PRESERVED BY THE RNC

| Name | E-mails sent | E-mails rcvd | Date of first avail. e-mail | Date of last avail. e-mail | E-mails sent to .gov | E-mails rcvd from .gov |
|---|---|---|---|---|---|---|
| Bartlett, Dan | 0 | 2 | 4/1/2007 | 4/1/2007 | 0 | 0 |
| Best, Trey | 4,650 | 7,203 | 9/2/2002 | 4/27/2007 | 1,368 | 2,356 |
| Britt, Mike | 3,589 | 5,147 | 2/2/2007 | 4/27/2007 | 830 | 1,218 |
| Cherry, Jane | 10,789 | 16,693 | 12/7/2005 | 4/27/2007 | 3,654 | 6,376 |
| Damas, Raul | 7,842 | 30,192 | 8/22/2001 | 4/27/2007 | 2,068 | 14,184 |
| Danforth, Melissa | 13,887 | 24,915 | 9/20/2001 | 4/27/2007 | 8,189 | 16,529 |
| Dennard, Paris | 12,780 | 20,590 | 4/22/2004 | 4/27/2007 | 3,922 | 8,140 |
| Ellis, Michael | 7,326 | 14,678 | 4/5/2006 | 4/27/2007 | 1,061 | 1,048 |
| Felts, Jonathan | 12,008 | 17,003 | 6/30/2006 | 4/27/2007 | 4,167 | 7,213 |
| Goergen, BJ | 1,243 | 5,676 | 10/17/2003 | 4/27/2007 | 650 | 809 |
| Hernandez, Israel | 0 | 495 | 1/16/2006 | 4/27/2007 | 0 | 0 |
| Hughes, Taylor | 608 | 4,453 | 3/9/2005 | 4/27/2007 | 111 | 1,540 |
| Huntsberry, Jason | 5,681 | 8,535 | 2/20/2002 | 4/27/2007 | 1,475 | 6,955 |
| Jackson, Barry | 8,020 | 9,560 | 1/7/2004 | 4/27/2007 | 1,264 | 1,929 |
| Jennings, Scott | 15,909 | 19,289 | 1/1/2003 | 4/27/2007 | 3,315 | 5,138 |
| Kubena, Korinne | 3,708 | 5,193 | 1/22/2007 | 4/27/2007 | 1,204 | 1,880 |
| Martin, Cathie | 0 | 129 | 1/27/2006 | 4/26/2007 | 0 | 0 |
| McBride, Anita | 0 | 5 | 6/10/2005 | 9/5/2006 | 0 | 0 |
| McBrien, Lauren | 11 | 43 | 10/19/2006 | 4/4/2007 | 2 | 4 |
| McLaughlin, Mindy | 9,848 | 13,498 | 9/5/2006 | 4/27/2007 | 3,129 | 6,638 |
| Raines, Mel | 1,015 | 1,444 | 10/1/2006 | 4/27/2007 | 342 | 479 |
| Ralston, Susan | 18,452 | 17,213 | 12/17/2002 | 4/27/2007 | 3,188 | 1,832 |
| Rosenberger, Cliff | 3,635 | 5,290 | 2/15/2007 | 4/27/2007 | 896 | 1,672 |
| Rove, Karl | 46,801 | 93,415 | 1/2/2002 | 4/27/2007 | 24,073 | 51,301 |
| Schlapp, Matt | 1 | 120 | 2/21/2007 | 4/10/2007 | 0 | 2 |
| Seaton, Jon | 6,589 | 921 | 1/31/2006 | 4/27/2007 | 1,273 | 278 |
| Sforza, Scott | 70 | 73 | 10/31/2006 | 2/26/2007 | 29 | 22 |
| Sinatra, Nick | 974 | 1,302 | 4/1/2007 | 4/27/2007 | 206 | 375 |
| Smith, Brad | 6,954 | 9,812 | 1/10/2007 | 4/27/2007 | 964 | 2,653 |
| Soper, Steven | 13,096 | 20,286 | 9/7/2006 | 4/25/2007 | 3,141 | 4,279 |
| Swineheart, Jessica | 3,618 | 7,764 | 9/8/2006 | 4/26/2007 | 955 | 1,927 |
| Taylor, Sara | 31,061 | 34,957 | 11/5/2002 | 4/27/2007 | 3,699 | 8,032 |
| Thomas, Travis | 996 | 3,299 | 5/14/2003 | 4/27/2007 | 27 | 631 |
| Thompson, Nicholas | 1,336 | 1,813 | 3/1/2007 | 4/27/2007 | 145 | 234 |
| Webster, Jocelyn | 5,296 | 4,839 | 6/14/2006 | 4/26/2007 | 1,823 | 1,850 |
| Wehner, Peter | 273 | 775 | 10/8/2006 | 4/27/2007 | 111 | 80 |
| Willeford, Emily | 2,549 | 6,469 | 12/19/2006 | 4/26/2007 | 1,459 | 4,320 |
| OPA Intern | 317 | 344 | 2/21/2007 | 4/27/2007 | 110 | 148 |

Source: Letter from Robert K. Kelner to Rep. Henry A. Waxman (May 30, 2007).

# EXHIBIT 3

*THE WHITE HOUSE REGULAR BRIEFING; BRIEFER: DANA PERINO, WHITE HOUSE DEPUTY SPOKESMAN; LOCATION: WHITE HOUSE CONFERENCE CENTER, WASHINGTON D.C. Federal News Service April 13, 2007 Friday*

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

**April** 13, 2007 Friday

**SECTION: WHITE HOUSE BRIEFING**

**LENGTH:** 4378 words

**HEADLINE:** THE WHITE HOUSE REGULAR BRIEFING;
BRIEFER: DANA PERINO, WHITE HOUSE DEPUTY SPOKESMAN;
LOCATION: WHITE HOUSE CONFERENCE CENTER, WASHINGTON D.C.

**BODY:**

THE WHITE HOUSE REGULAR BRIEFING BRIEFER: DANA PERINO, WHITE HOUSE DEPUTY SPOKESMAN LOCATION: WHITE HOUSE CONFERENCE CENTER, WASHINGTON D.C. TIME: 1:40 P.M. EDT DATE: FRIDAY, APRIL 13, 2007

MS. PERINO: Good afternoon. Happy Friday.

Q Good afternoon.

Q Happy Friday.

MS. PERINO: Okay, I don't have anything to announce, so I'll just go to questions.

Q Have you been able to determine why Karl Rove's ability to delete e-mails was --

MS. PERINO: No, not between the gaggle and now I haven't.

Q Okay. How about the list of the 22 officials, are you ready to release that?

MS. PERINO: No. But we've taken it under consideration. So no, I don't have that ready yet. But we are consulting. Obviously, we're in communication with the committee, meaning the House Judiciary committee, as well as the RNC general counsel. And so a lot of these things are being discussed at that level. And so in between 10:00 and now, I wasn't able to get a conclusion.

Q Do you know whether White House officials were able to delete their own e-mails, even after this archival policy went into effect?

MS. PERINO: White House officials? You mean somebody like myself?

Q People who had the RNC accounts.

MS. PERINO: Okay, that deleted their own e-mails --

Q After the 2005 archive provision went into effect.

MS. PERINO: I guess --

Q Did they retain the ability?

MS. PERINO: I believe that that would have been within the realm of possibility, but I don't know of anybody that -- again, we don't know of anybody that actually was doing that, to my knowledge, and we do not have any indication that there was any basis to conclude that there was any wrongdoing, intentional wrongdoing in the use of the RNC e-mails. And the -- you're talking about the double delete function, where you can delete your in -- delete your deleted files?

Q (Off mike.)

MS. PERINO: I don't know.

Q Is there a limit to the mailbox size with the RNC accounts? Do you know that level of detail, whether you'd have to delete at some point or you couldn't get any more e-mail?

MS. PERINO: I don't know. I know that oftentimes our computers are -- can slow down, but we have an automatic archiving system that comes through and cleans it up for us. And all of those --

Q Automatic archiving.

MS. PERINO: -- all of the e-mails except for the ones -- the very small slice of the universe I've told you about that have the "gwb" accounts -- any e-mail that comes -- that touches any part of an EOP or White House server or our computer, those are automatically preserved.

Q The Democrats are concerned that perhaps these accounts were used in order to keep information harder to be under public scrutiny, harder to find through discovery, things like that. They're not satisfied that these e-mails can't be retrieved. What --

MS. PERINO: Well, I would caution against anyone making any broad, sweeping conclusions. What we have done is come forward to talk about the small slice of universe -- the small slice of the universe of the e-mails that we've identified that have the potential to possibly not be there. And again, I think that one of the things that's difficult is the things that we don't know, and we don't know them but we're trying to find them out.

And there are ways that you can retrieve any e-mails that are potentially lost, and we are beginning conversations with outside consultants, forensic consultants, who could tell us the best way to do that, the best way to retrieve those. But again I would stress to you that we've seen no basis to conclude that there was any intentional wrongdoing with the use of these e-mails.

Q But this was a problem, a mistake.

MS. PERINO: You know, I said it yesterday. I think I said it concisely.

Q Dana, if I could follow, we have mentioned before the group called Citizens for Responsibility and Ethics in Washington. They issued this report, and they are saying their analysis shows that between March 2003 and October 2005, there were hundreds of days where e-mails were missing, this being in the White House system, not the RNC, and that this equated -- it was estimated that roughly over 5 billion e-mail messages were missing.

MS. PERINO: I don't know if that group actually has -- I don't know how they do an analysis on an internal White House system. But I did check it out, and we are in communication with the Office of Administration to see if there are days or partial days when there were e-mails that would have gone missing.

And in terms of -- "missing" is a word that -- maybe misplaced, or not necessarily lost forever.

I think, you know, there are backup tapes. There are different ways in order to go back and find e-mails.

In talking with them and with the counsel's office, there is no indication that anyone who was working on a server, or in terms of a technical capability that would be able to look at a server, clean up a server, or in terms of when we converted to Lotus Notes to Microsoft Outlook, if there would have been any potential loss there, that there was any intentional loss of any document. I think that those folks take their jobs very seriously and endeavor to make sure that all the records are preserved for the Presidential Records Act, as well as the Federal Records Act.

Q So just to be clear, are you taking issue with their conclusions? Or are you just saying, we're --

MS. PERINO: I'm not taking issue with their conclusions at this point. We're checking into them. And again, you know, there's 1,700 people in the executive office of the president. I don't know how -- we'll try to find out how many e-mails a day are sent with that many people. I can assure you it's a high number.

And but I also would tell you that the technical folks that we've spoken to, and the preliminary discussions was that if there had been an inadvertent human error or a technical problem, where there were days where e-mails might have been misplaced that either one, it wouldn't have been intentional. And two, there are ways that we can try to gather those if need be. But think about it. I mean, there are some times, and I don't have a list of the days with me. But if it was a Saturday or a Sunday, oftentimes because we have such a large organization that works 24/7 but mostly Monday through Friday, if they do any maintenance on our servers, just like in your organizations, they often do it on times when it's slow periods. And so if they are looking at those days, I mean, we just need to do a little bit more work before I can answer definitively.

Q So to your knowledge, there's no problem within the White House e-mail system in terms of messages or e-mails that have been deleted. Or at this point, you just don't know.

MS. PERINO: No, what I'm saying is that the way that the system is set up and the way to comply with the Presidential Records Act is that any e-mail that comes to or from a White House account, an EOP account, you know, that you all e-mail us on, those are automatically preserved. Their question was specific, not to GWB e-mails but to White House account e-mails. And their question is, there are allegations that there could be whole days missing.

And what I'm saying is, we're looking into that. But I would caution people from making any broad conclusions about that for the reasons I've stated, which is there's no indication that that would have been intentional. And there are ways that you can find, you know, missing e-mails, and that's one of the ways that they do that. I'm not a technical expert, but they have the expertise on that.

Q And just a quick follow-up here: They allege that White House Counsel Harriet Miers was informed of this problem at the time, these missing e-mails, and that they -- that she didn't do anything about it or the White House didn't do anything about it.

Are you aware of that or --

MS. PERINO: I haven't spoken to Harriet. Obviously she's no longer working here. But we are -- Scot Stanzel and I are working to find as much information as possible, and we're talking to the Office of Administration. Remember, we don't have the same personnel necessarily that we had three or four years ago. So we're working to get the answers for you.

Go ahead.

Q Dana, can we -- (inaudible) -- for just one moment? You had to change your policy here. Why?

MS. PERINO: Well, as I said, this -- now stepping back away from that particular problem on EOP e-mails and talking about -- specifically about GWB/RNC-hosted accounts, out of an abundance of caution at the beginning of the administration there were two basic notices in terms of policy on this issue. One was official White House business should be done on official White House accounts. The second one was -- and it was much more extensive -- how an individual who has responsibilities in both the political and the officials worlds would avoid violating the Hatch Act. And that was very explicit, and the Hatch Act says you cannot use a government-issued computer or any sort of government-issued equipment, which is paid for by taxpayer dollars, to do any sort of political business. And so out of an abundance of caution, and because people were concerned about violating the Hatch Act, and because of convenience in terms of managing multiple devices.

As the BlackBerrys became more ubiquitous, the policy wasn't always followed correctly. And so we decided that the best thing to do was to let you know that, and to -- secondly, to have a new policy, one that makes it much more clear and gives the employee much more clear guidance. There was a failing both on not having a clear guidance, not having good management or overseeing of the issue, and then individuals not following through on the guidance.

Again, I think it was more -- I don't think it was intentional, and there's no indication that there was anything improper or improper use of these RNC e-mails. But it is better now to have a clearer policy in which people know exactly where the lines are, and if they have questions about where they fall in a gray area and where the line is, the counsel's office has let them know that their door is open and that they're happy to help them make those judgments.

Let me go over here.

Sheryl.

Q Could you enunciate what that policy is and when it went into effect?

MS. PERINO: It was recently, only in the last couple of weeks or so, I think.

Q And what is that policy?

MS. PERINO: I think it's what I've just described to you, which is that you still need -- White House business still needs to be done on White House official accounts. Political -- I see your point -- political affairs business needs to be done on your RNC account. We want to make sure that people aren't using government-sponsored -- or government paid-for equipment to do political business. But that out of an abundance of wanting to make sure we're complying with the Presidential Records Act, that you should figure out a way to preserve those documents; so either by printing them out or saving them in some way on your computer, or

cc'ing yourself so that if in the future at any time the counsel's office needs to review those documents, they are available.

Q But, Dana, I'm not clear on -- you said the policy wasn't always followed before.

MS. PERINO: Right.

Q Then is there an indication of wrongdoing there, any violation --

MS. PERINO: Well, I think the way to describe it would be that there is no indication that anyone was intentionally not following the policy. I think that the policy wasn't very clear and that people needed a clearer policy, and especially because technology changed pretty rapidly. I think people at the White House -- and I don't know about you all -- but, you know, we didn't have access to BlackBerries until well after -- right around after September 11th. And so -- and then at that point, it was only very few people, and now it's much more widespread.

Q Are you saying there was no violation of the Hatch Act? I mean, you just said the policy wasn't always followed. So what does that mean, in fact?

MS. PERINO: I don't know of anybody that violated the Hatch Act.

Q (Off mike.)

MS. PERINO: I don't know of anyone that would -- that violated the Hatch Act or would have intentionally violated the Hatch Act.

Q Dana, just following up on that -- two questions. First, at the outset of the administration, you have this policy. Were there efforts, training -- was it just a written policy that was distributed? How was the policy communicated to your staff?

MS. PERINO: I've worked here a long time. I can't remember. I do know that we get a written policy. I do know that there -- and there is ethics training for everyone. I can't remember specifically how this was described in that ethics training.

Q And you said -- actually three questions -- you said there wasn't enough oversight of the policy.

MS. PERINO: Mm-hmm.

Q Whose job is it to oversee that people were adhering to this policy -- (off mike)?

MS. PERINO: You know, that's a good question. And I don't know specifically -- you know, I think it was more a definition of senior staff, senior management.

Q Okay. And then with respect to Karl, Henry Waxman, after his meeting with the RNC -- or his aide's meeting with the RNC lawyer yesterday, wrote a letter stating that the committee had in 2005 adopted a policy specifically aimed at Karl Rove that precluded him from manually deleting his e-mails from the RNC server. Why did the RNC need a special policy for Karl Rove?

MS. PERINO: As I said this morning, there are ongoing discussions between our counsel's office and the RNC general counsel, and it's just not something that I'm able to answer right now. I understand that you want the answer; I just don't have it for you.

Go ahead.

Q When you talk about the guidance -- (off mike) -- the administration, our understanding is that Gonzales, when he was in the White House Counsel's Office, he issued some guidance on this. Is that true? And can you release that guidance?

MS. PERINO: Can I look into it and --

Q Yeah.

MS. PERINO: It would follow that as counsel to the president and in charge of --

Q Right.

MS. PERINO: -- the Ethics Council, that that's not illogical, but I need to check.

Q Can that be released so we could actually see what --

MS. PERINO: We do not release internal White House documents, but I'll take a look.

Q (Off mike) -- it was unclear, it was confusing, that way we could see for ourselves and, you know, judge it.

MS. PERINO: Yeah. Go ahead, John.

Q Have you read or been briefed on the letter from Waxman to Gonzales?

MS. PERINO: I have read the letter.

Q Okay. Because at the end it seems to indicate that Rove's e-mail capabilities were changed -- and I'm sorry, I don't have the specific language in front of me, but it seems to indicate that his e- mail capabilities were changed because of an investigation. There's some mention of an investigation.

MS. PERINO: This falls within what Sheryl was asking about. It's just not something I can answer right now.

Q Do you think that this increased focus on Karl Rove's e- mail and possibly his e-mails being missing might give more ammunition to Democrats who want to see him brought up --

MS. PERINO: My experience has been that any time Karl Rove's name is mentioned, it adds to the ammunition, regardless of merit.

Peter?

Q (Off mike) -- merit?

MS. PERINO: No comment.

Go ahead, Peter.

Q Following up on a question from yesterday, were you able to determine who determined that the e-mails were missing and how this was determined?

MS. PERINO: Broadly, but not specifically. In terms of the counsel's office review, I think that's when they realized that -- remember the Justice Department has been working on to be responsive to the Congress with providing the documents that they asked for, and in one

of those documents it showed that a White House employee had sent an e-mail to Justice Department and it was from a "gwb" account, and that's what raised a question about it. There's nothing improper about using that account, but that's where it initiated. So I think that from there, that's where they started looking into it more.

Q Someone went back and looked into that and found that it and others were missing? Is that what you're saying?

MS. PERINO: I'm not saying that anyone has said that they were missing. The question is, is there a potential that some could have been lost? And yes, there is a potential that some could have been lost, but we don't have a definition in terms of that universe or an answer specifically on that until we are able to talk more about the forensics.

Q You've been talking about so many policies today and in the other briefings. Just to try to clarify, you said the policy wasn't clear, the policy was not always followed correctly. Which policy or policies --

MS. PERINO: Just specifically about -- the example that I can give you is that -- from the White House manual that I have looked at, there is, you know, one paragraph explaining -- you know, it's a short paragraph explaining that you should do White House official business on your White House official account. And then, when you get to the part about how to avoid violating the Hatch Act, there's two pages of very explicit instruction. That's why I say that that policy was a little bit more clear.

Go ahead --

Q And that's been sharpened now?

MS. PERINO: Yes.

Go ahead.

Q Dana, I want to go back in time related to what Sheryl was asking. When the White House counsel told the White House employees to be in full compliance with the subpoenas or requests for information in the Plame investigation, for example, did the counsel's office, with knowledge of the RNC accounts which the counsel did have, instruct or inform the RNC that White House officials should all be responsive to the subpoenas in relation to their RNC account?

MS. PERINO: Going back to the Plame investigation?

Q Yes. And were --

MS. PERINO: I don't -- I don't know the answer to that. And to avoid --

Q That, and whether any information was then transferred from the RNC to the White House, and then the White House to the investigator.

MS. PERINO: I will check into it and I'll see what we can say.

Q And then the second question I have is, currently now the White House network system has a pop-up message, when or if employees try to delete something, that says you can't delete, you're in violation of the blah, blah, blah law.

MS. PERINO: I must not have ever violated it because it's never popped up on my computer! I don't know what you're talking about. I've never seen it.

Q Give it a try!

Q So you've never seen it? My question is, is the new policy now installing that sort of message in any way on the RNC accounts?

MS. PERINO: Not that I'm aware of. But again, I've never seen such a message, so I'll have to check into it.

Let me go to Suzanne, and then I'll go to the back again.

Q You keep saying that there's no indication that anybody willfully or intentionally misused the e-mail system. What is that based on? Is the White House conducting interviews with the 22 people who had double accounts or --

MS. PERINO: I'll decline to talk about the internal review that we have that is ongoing. But I feel pretty confident in the source that I talked to that we are able to say that there is no basis to say that anyone was improperly and intentionally misusing one of the accounts that they were provided to avoid violating the Hatch Act. There's just no -- there's no indication of that. And that's why I encourage people to not make any broad, sweeping conclusions about this and to understand that our position has been let's let people know that we think we had a problem, we're going to fix the problem, and we're going to be working with the committee, both the RNC and then the House Judiciary Committee in their inquiry.

Q So is it fair to say that at least those 22 people have been approached in some way by the White House through your investigation, and you've been reassured that their intentions were --

MS. PERINO: Since I don't know that -- I don't know specifically is that true about all 22 people, let me check into it.

Q Karl Rove, perhaps?

MS. PERINO: I think he's aware. He's aware.

Q Dana?

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————————

DEMOCRATIC NATIONAL COMMITTEE,    )
                                  )
             Plaintiff          )
                                  )  Civil Action No. 07-712 (ESH)
       v.                   )
                                  )
UNITED STATES DEPARTMENT OF     )
JUSTICE,                             )
                                  )
             Defendant      )
————————————————————————)

## [PROPOSED] ORDER

Upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Cross-Motion and Opposition and Defendant's Reply thereto, it is hereby this __ day of _____, 2008:

ORDERED, that Defendant's Motion for Summary Judgment be and it is hereby DENIED; and

FURTHER ORDERED, that Plaintiff's Cross-Motion for Summary Judgment be and it is hereby GRANTED; and

FURTHER ORDERED, that Defendant shall produce all documents withheld by the Department of Justice Office of Information and Privacy as described in defendant's *Vaughn i*ndex, within ___ days of the date of this order.

————————————————————

ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE